# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MICKEY MILAM,     )
           )
  Plaintiff,     )
           )
v.          )  **Case No. 3:23-cv-00238**
           )  **Judge Aleta A. Trauger**
ASCAP d/b/a THE AMERICAN )
SOCIETY OF COMPOSERS,  )
AUTHORS & PUBLISHERS,  )
           )
  Defendant.    )

## MEMORANDUM

Following the Stipulation of Partial Dismissal and Order dismissing plaintiff Mickey Milam's claims under the Age Discrimination in Employment Act (Doc. No. 40), the remaining claims at issue in this lawsuit, as set forth in the Second Amended Complaint ("SAC") (Doc. No. 29), are claims under the Americans with Disabilities Act ("ADA") for failure to accommodate/failure to engage in the interactive process, discrimination, and retaliation. Now before the court is the Motion for Summary Judgment (Doc. No. 37) filed by the defendant, the American Society of Composers, Authors & Publishers ("ASCAP"), seeking judgment in its favor on those claims.

For the reasons set forth herein, the court will grant in part and deny in part the defendant's motion. Specifically, the court finds that material factual disputes preclude summary judgment on the discrimination claim but will grant summary judgment on the failure to accommodate/failure to engage in the interactive process and retaliation claims.

# I.    LEGAL STANDARDS

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.     FACTS AND PROCEDURAL HISTORY[1]

### A.     The Plaintiff's Employment

Mickey Milam provided security services to defendant ASCAP as an independent contractor from 1992 until November 22, 2021, first through his own security business and then, beginning in 2016, in an individual capacity. On November 22, 2021, Milam became a full-time ASCAP employee. Milam's title was Senior Manager, Facilities and Security (a newly created position), with a base salary and eligibility to participate in ASCAP's benefit programs. Milam viewed his transition to full-time employment and the accompanying benefits as a positive development.

Elizabeth ("Beth") Matthews is ASCAP's Chief Executive Officer. Brian Roberts has been employed by ASCAP since March 30, 2015, and has held the titles of Executive Vice President, Chief Operating Officer, interim Chief Financial Officer, and, since April 2019, Chief Financial Officer. Roberts encouraged ASCAP to offer Milam full-time employment, and Matthews approved the hire. Roberts considered Milam a good worker who was responsive to ASCAP's needs.

Patricia Erickson has been employed by ASCAP with the title of Senior Vice President, Head of Human Resources since March 1, 2021.

Gloria Svabenik has been employed by ASCAP with the title of Senior Director, Business Services since December 1, 2021.

---

[1] The facts set forth herein for which no citation is provided are derived from the plaintiff's Response to ASCAP's Statement of Undisputed Material Facts (Doc. No. 44) or the defendant's Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 50) and are undisputed for purposes of summary judgment. All facts set forth herein are either undisputed for purposes of the defendant's motion or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

As a contractor and when he began working as a full-time employee, Milam reported to Roberts. Shortly after Milam became an ASCAP employee, ASCAP hired Svabenik as Senior Director, Business Services, effective December 1, 2021. From that point, Milam reported to Svabenik, who reported to Roberts. Svabenik spoke to Milam for the first time on December 8, 2021, during an introductory video call with other ASCAP employees. (Doc. No. 39-52, Svabenik Decl. ¶ 6.)

Roberts, Svabenik, and Erickson were based in ASCAP's New York office for the entire period of Milam's regular, full-time ASCAP employment. From March 2020 when the COVID-19 pandemic began until the end of Milam's employment, the plaintiff communicated with Roberts and Svabenik (once she was hired) only by text message, email, phone calls, and video calls.

Milam understood Roberts' and Svabenik's expectations and had no communication problems during that period. Neither Roberts nor Svabenik ever had any difficulty understanding Milam's speech in any phone call or video call. Neither Roberts nor Svabenik ever observed any facial weakness, paralysis, or drooping during any video call with Milam. (Svabenik Decl. ¶ 11; Doc. No. 39-49, Roberts Decl. ¶ 13.)

In mid-March 2020, ASCAP closed all of its U.S. offices, including its Nashville office, in response to the COVID-19 pandemic. Milam was among the small group of individuals allowed in the ASCAP Nashville office while it was closed in 2020 and 2021. During that time, he provided the same on-site security services he had provided prior to the COVID-19 pandemic and also coordinated with employees and others to ensure that they presented the necessary proof of vaccination to comply with ASCAP's policies.

**B.    The Plaintiff's Medical Record**

According to records from a July 2, 2018 office visit to his primary care physician, Milam reported that, while grilling hamburgers on the evening of June 30, 2018, he lost his sense of taste,

and he woke up on July 1, 2018 with a "drooping eyebrow, [left] eye, and mouth on [left] side, numbness on [left] side of tongue as well." (Doc. No. 39-20, at 37.) He was diagnosed by Dr. William Serafin with "Left-sided Bell's palsy."[2] (*Id.*) This was Milam's first episode of Bell's palsy. Dr. Serafin noted that Milam's symptoms at the time were "mild and already improving after just 1 day of symptoms," such that he did not recommend any treatment (such as steroids) except an eye patch at night if needed. (*Id.* at 39.) Although Milam testified in his deposition that his symptoms were not actually improving when he saw Dr. Serafin and that they worsened on July 3, 2018 while he was traveling for vacation, other than an alleged visit to a walk-in clinic in Hawaii on July 3, 2018, he never sought further treatment for this episode of Bell's palsy. (Doc. No. 42-1, Milam Dep. 137–42.) There is no evidence that anyone at ASCAP knew about this episode at the time or that it affected Milam's job performance.

Milam was involved in a motor vehicle accident ("MVA") in early 2019. A treatment note from his annual physical with treating physician Dr. Thomas DiNella in July 2019 reflects that Milam reported having experienced tinnitus[3] "since 2/8/19 MVA" but had "good energy level and was sleeping well." (Doc. No. 39-16, at 20.) His treatment notes for his annual physical in September 2020 likewise reflect a history of Bell's palsy and bilateral tinnitus, and, although he passed his "hearing screen," his "problem list" included "[h]earing loss, sensorineural, bilateral." (*Id.* at 14.)

---

[2] Bell's palsy is "an unexplained episode of facial muscle weakness or paralysis," usually on one side, that generally "begins suddenly and can get worse over 48 hours." https://www.hopkinsmedicine.org/health/conditions-and-diseases/bells-palsy. It is usually temporary, with most people recovering within two weeks to six months from the onset of symptoms, and most people recover full facial strength and expression. *Id.* The paralysis becomes permanent on rare occasions. *Id.*

[3] Tinnitus is the subjective sensation of hearing ringing, buzzing, hissing, chirping, whistling, or other sounds in one's ears. It varies in intensity and is generally uncurable. *See, e.g.*, https://www.webmd.com/a-to-z-guides/understanding-tinnitus-basics.

Milam received the single-dose Johnson & Johnson COVID-19 vaccine on March 24, 2021. According to Milam, he suffered several health impairments "almost immediately" after receiving the vaccine. Specifically, he testified that he began having "hearing problems like when you jump in a swimming pool and your head's full of water," and "[t]hat went on for days." (Milam Dep. 14.) In addition, he claims that "slowly but surely as time went on," he "lost more and more hearing in [his] right ear and developed . . . tinnitus." (*Id.*) He also asserts that he experienced a second episode of Bell's palsy shortly after the first shot. (*Id.* at 17.) He testified that, within a day or two after the vaccine, he "started feeling problems with [his] face." (*Id.* at 144.) He claims this episode of Bell's palsy lasted a "period of weeks." (*Id.* at 147.) He did not seek medical treatment at that time, and there is no evidence that anyone at ASCAP with whom he worked was aware of hearing issues or this purported episode of Bell's palsy or that they affected his job performance.

According to the medical records produced in discovery, Milam did not receive any healthcare or medical treatment between the date of his COVID-19 vaccine in March 2021 and his September 20, 2021 annual physical with Dr. DiNella.[4] The treatment notes for the office visit on that date again report a history of Bell's palsy, but they do not indicate that Milam reported an adverse reaction to the COVID-19 vaccine or having had a second episode of Bell's palsy. (*See* Doc. No. 39-16, at 11–12.) He was also noted again to have a history of tinnitus and to have bilateral, sensorineural hearing loss, but the medical record does not reflect that he believed his hearing or tinnitus had worsened since, or because of, the vaccine. (*Id.* at 12–13.)

Milam returned to Dr. DiNella on December 1, 2021, reporting a sudden onset of severe tinnitus and hearing loss in his right ear three days previously. (*See id.* at 6 ("The onset of the

---

[4] The plaintiff states that this statement of fact is "[u]ndisputed for purposes of this pleading [sic], even if disputed in fact." (Pl.'s Resp. SUMF ¶ 64.) He apparently has not produced records establishing that he sought or received medical care during that time period.

tinnitus has been sudden and has been occurring in a persistent pattern for 3 days. The course has been constant. It is characterized as buzzing. It affects the right ear. . . . The tinnitus has been quite loud and persistent. He has a history of tinnitus post MVA in 2018,[5] which had improved.").) The medical records for that visit do not reflect that either Dr. DiNella or Milam associated the increased tinnitus and sudden hearing loss with the March 2021 COVID-19 vaccine or with the Bell's palsy Milam allegedly experienced after receiving the vaccine. Milam asserts that the medical records "do not transcribe discussions between the physician and patient." (Doc. No. 44, Pl.'s Resp. Statement of Undisp. Material Facts ¶ 76.)

Dr. DiNella noted his intention to refer Milam to an Ear, Nose and Throat ("ENT") specialist, and Milam was seen that same day, December 1, 2021, by Dr. Elisabeth Guthrie at ENT Specialists of Nashville ("ENT of Nashville"). (Doc. No. 39-18, at 19.)[6] Dr. Guthrie's records similarly reflect that Milam reported that he had awakened in the middle of the night three days before with sudden and severe "tinnitus and decreased hearing." (*Id.*) He reported that the tinnitus first started with a motor vehicle accident two years previous and that his first episode with Bell's palsy had occurred in 2017.[7] (*Id.*) He also reported that, "in March 2021 he had ptosis[8] of the same left eye after receiving the Johnson and Johnson COVID vaccine," but the record does not reflect that Dr. Guthrie associated the sudden-onset hearing loss and worsened tinnitus with the COVID-19 vaccine or with Bell's palsy. (*See id.*) His audiogram the same day revealed "[m]ild to moderate

---

[5] The medical record elsewhere reflects this MVA occurred in 2019. (*See* Doc. No. 39-16, at 20.)

[6] The plaintiff states that he went to see Dr. Guthrie on his own, because Dr. DiNella scheduled him for a "hearing test" "10 days out." (Milam Dep. 27.)

[7] Dr. Serafin's records reflect that the Bell's palsy episode occurred in July 2018. (Doc. No. 39-20, at 37.)

[8] Ptosis is defined as "a drooping of the upper eyelid." https://www.merriam-webster.com/dictionary/ptosis.

high-frequency sensorineural hearing loss left ear and severe [sensorineural hearing loss] right ear." (*Id.* at 21.) He was prescribed a 21-day tapering course of high-dose steroids. (*Id.* at 19.)

Milam testified that he believed his hearing started worsening immediately after he received the COVID vaccine, though there came a point when it became suddenly worse. (Milam Dep. 37, 76.) He also claims that, although he had preexisting tinnitus, his symptoms "increased exponentially after the Bell's palsy episode in March 2021 and COVID-19 vaccine." (Doc. No. 45-27, Milam Decl. ¶ 10.) Nothing in his medical records connects Milam's alleged Bell's palsy to hearing problems, and Milam admitted under oath that no healthcare professional ever diagnosed his hearing problems as connected to his alleged Bell's palsy. (Milam Dep. 172.)

In any event, Milam returned to ENT of Nashville on December 8, 2021, after seven days on steroids, at which time Nurse Practitioner Shavonne Morgan noted that Milam reported his "hearing ha[d] improved by 40%" and his tinnitus had "improved slightly," and Dr. Guthrie noted that his Audiological Report reflected "Slight Improvement in right ear thresholds since previous audiogram." (Doc. No. 39-18, at 17, 15.) On January 3, 2022, Milam had a follow-up appointment, at which he was seen by Nurse Practitioner Morgan and Dr. Mark A. Williams. (*Id.* at 12–14.) Morgan noted that Milam reported "some improvement" in both the hearing and the tinnitus after the steroid taper, and she recommended a repeat audiogram in six months. (*Id.* at 14.)

ENT of Nashville's records reflect that Milam called and spoke with Shareka Woods on January 17, 2022 at 9:18 a.m., asking for a call back from Dr. Guthrie. (*Id.* at 11.) Under "Actions Taken," the note further states:

> Patient called concerned about getting the COVID vaccine. His employer is requiring booster shots and after his previous J&J vaccine he suffered Bell's Palsy and is worried if he gets the booster he will get the palsy again. Explained to pt that I can't say whether or not he will get bells palsy after a booster. Advised patient to speak with his PCP on the matter.

(*Id.*) The note is electronically signed "Guthrie, Elisabeth K 1/18/2022 2:54:53 PM." (*Id.*) Dr. DiNella was Milam's primary care physician at the time, but Milam did not contact Dr. DiNella.

ENT of Nashville's records further reflect that Milam had several communications with the office between January 24, 2022 and February 14, 2022 about scheduling an MRI and then obtaining the results of the MRI, which were unremarkable. (*Id.* at 6–10.) Milam next communicated with the office, as reflected in the medical records, on March 23, 2022, when he called to request a copy of "all his medical records available in our office." (*Id.* at 5.) This entry reflects that Milam reported having stopped by the office the previous Friday, March 18, 2022, to fill out a medical release form and that he told the receptionist that he "needs his medical records for suing his previous job after firing him for refusing to take the covid booster shot." (*Id.*)

Milam visited ENT of Nashville for the final time on August 5, 2022. He underwent an audiogram that revealed "[e]ssentially stable hearing compared to previous audio in January," with "stable hearing in the [right] ear and slight decrease in the left ear." (*Id.* at 2–3.) Milam was documented as reporting that he was "doing well with current hearing aids" and was to "continue tinnitus masking techniques." (*Id.* at 3.)

### C.    ASCAP's Vaccination Policy

While Milam was employed by ASCAP, emails sent to "everyone@ascap.com" were received by any individual (employee or otherwise) with an "@ascap.com" email address. Emails sent to "all_employees@ascap.com" were received by any ASCAP employee with an "@ascap.com" email address. ASCAP Human Resources and management used these two email addresses to send reminders, notices, policies, and other important communications to ASCAP employees. Beginning in 2016, Milam had an ASCAP email address and would have received all emails addressed to "everyone@ascap.com" and "all_employees@ascap.com."

On August 20, 2021, CEO Elizabeth Matthews sent an email to "everyone@ascap.com" with the subject line "Update on Office Reopening." Milam specifically recalls receiving the email. The August 20, 2021, email announced that, "while [ASCAP] had hoped to reopen [its] offices on a voluntary basis on September 9th, the global Delta variant trends [were] very concerning." (Doc. No. 39-11, at 2.) As a result, ASCAP "decided to delay the reopening of [its] offices until at least October." (*Id.*) ASCAP announced that, "[w]ith very limited exceptions, coming to the office [would] remain[] voluntary until February 1, 2022." (*Id.*) The email continued, "**[g]iven the change of circumstances and surging COVID-19 infection rates, we have made the decision that <u>you must be fully vaccinated to enter any of our U.S. offices</u>.**" (*Id.* (emphasis in original).) While ASCAP at the time considered anyone to be "fully vaccinated" "two weeks after you get your second dose of a two-dose vaccine, or two weeks after a single dose of a one-dose vaccine," the email also stated that "[e]ventually this requirement may be extended to boosters." (*Id.*)

On November 5, 2021, Matthews sent an email to "everyone@ascap.com" with the subject line "Celebrating Our Return to the Office." (Doc. No. 39-12, at 2.) Milam specifically recalls receiving the email. The November 5, 2021, email announced that the "partial reopening" of ASCAP's New York office "went off without a hitch," and the company was "looking forward to welcoming back employees who are eligible and who choose to return in London, Los Angeles, Nashville and Atlanta starting next week." (*Id.*) Matthews' email continued:

> As a reminder, all employees must be fully vaccinated by the time we return to mandatory in-office work, which could be as early as February 1, 2022. That means you must receive your second dose of a two-dose vaccine or your single dose of a one-dose vaccine at least two weeks prior to returning to the office. I encourage all employees to get their vaccines as soon as possible. This requirement may be extended to boosters as well.

(Id.)

As part of the partial reopening of ASCAP's offices, ASCAP employees were required to complete a daily health questionnaire either via a mobile phone application or manually (by sending completed questionnaires to "besafe@ascap.com") before traveling to an ASCAP office. ASCAP appointed "Site Safety Monitors," who were responsible for reviewing all responses collected during the daily COVID-19 screening process to ensure that all persons accessing the ASCAP offices were properly screened. The Site Safety Monitors were also the points of contact for employees who needed to report a change to their questionnaire answers or their health status.

Carole Resseque is an Executive Assistant at ASCAP. In 2021, as part of ASCAP's planned reopening, she was appointed a Site Safety Monitor for all of ASCAP's offices, including its Nashville office (though she was then, and still is, located in New York). In this role, if a Nashville ASCAP employee contacted besafe@ascap.com, Resseque was responsible for reviewing that communication and responding appropriately.

On November 24, 2021, Matthews announced via email to "everyone@ascap.com" that ASCAP was "moving forward" with plans to "reopen all ASCAP offices on a mandatory basis in 2022." (Doc. No. 39-13, at 2.) In the same communication, ASCAP announced its new COVID-19 vaccine policy (the "COVID-19 Vaccine Policy"). Milam specifically recalls receiving this communication. Under this Policy,

> In preparation for our mandatory reopening, all U.S. ASCAP employees must submit proof of full vaccination to Human Resources no later than February 1, 2022. You should receive your second dose of a two-dose vaccine or your single dose of a one-dose vaccine at least two weeks prior to returning to the office. *If six months have passed since your last shot, you will be required to submit proof of a booster dose.* This vaccination policy extends to all ASCAP employees, whether previously remote or in-office, except where prohibited by law or regulation as determined by ASCAP.

(*Id.* (emphasis added).)

It is undisputed that the Johnson & Johnson vaccine is a single-dose vaccine, and individuals who received it were initially considered to be fully vaccinated two weeks after a single dose of the vaccine. ASCAP knew that Milam had received the Johnson & Johnson vaccine in March 2021. There is also no dispute that, under ASCAP's COVID-19 Vaccine Policy, as of November 24, 2021, ASCAP defined "fully vaccinated" to include "proof of a booster dose" if six months had passed since an individual's last shot. (*Id.*)

The same November 24 email offered a $500 incentive payment to any employees who submitted proof of vaccination by December 13, 2021, and it also warned employees: "Your employment may be at risk if you do not submit the required proof of full vaccination by February 1, 2022; so please do not wait." (*Id.*) Regarding exceptions to the Policy, it added:

> Any employees whose sincerely held religious beliefs, medical issues, or disability prevents them from receiving a vaccination should contact our head of Human Resources, Patty Erickson, at perickson@ascap.com **no later than January 5, 2022** to request an accommodation. All requested supporting information will be due by January 15, 2022, in order to be considered for an accommodation.

(*Id.* (emphasis in original).) Milam testified that he understood that Erickson's email address was hyperlinked, such that all he needed to do to email Erickson was click on her email address in the message. (Milam Dep. 107.)

On December 3, December 7, December 10, and December 13, 2021, Human Resources sent emails to "all_employees@ascap.com," reminding employees that, under the COVID-19 Vaccine Policy, "all U.S. ASCAP employees must submit proof of full vaccination to Human Resources no later than February 1, 2022." (Doc. Nos. 39-32, 39-33, 39-34, 39-35.) Each of these emails also contained a reminder of the December 13 deadline for the $500 incentive payment.[9]

---

[9] On December 9, 2021, Victoria Hodgen, an ASCAP Human Resources professional, emailed Milam to remind him that he had previously provided proof of vaccination and was eligible for the $500 stipend for doing so. (*See* Doc. No. 39-21, at 2.)

On January 7, 2022, Matthews notified all ASCAP employees that, due to the Omicron variant and nationwide rising infection rates, "all of our ASCAP offices will remain closed until further notice and, therefore, all ASCAP employees should continue to work remotely." (Doc. No. 39-14, at 2.) The email included a reminder about the company's "vaccine requirements and deadlines," as follows:

> All ASCAP employees are required to be fully vaccinated as a term and condition of employment at ASCAP, unless you have received an approved exemption or where prohibited by law or regulation. You are considered fully vaccinated two weeks after completing primary vaccination with a COVID-19 vaccine, or after receiving a booster shot when you become eligible.
>
> [A]ll ASCAP employees must submit their proof of vaccination, including booster shots, no later than February 1st. If you are not eligible for a booster at the end of January, you must submit proof of your booster shot once you are eligible. Staying up to date with our COVID-19 vaccine policy is a requirement for employment at ASCAP. The February 1st deadline stands and is not dependent on the date we will be able to re-open our offices, on either a voluntary or mandatory basis.
>
> To be clear, for those employees who already submitted proof of vaccination, if you are now eligible for your booster shot, you must also submit proof of your booster by the February 1st deadline via email to vaxcards@ascap.com .
>
> Those employees who requested a medical or religious exemption by the January 5th deadline must submit their completed application forms to [Human Resources] by January 15th.

(Id.)

On January 21, January 25, January 26, January 27, and January 28, 2022, Human Resources sent emails to "all_employees@ascap.com," reminding employees to submit their proof of vaccination, updated with proof of a booster shot, where eligible. (Doc. Nos. 39-36, 39-37, 39-38, 39-39, 39-40.)

On January 28, 2022, Matthews sent an email to "everyone@ascap.com" with the subject line "Reopening Update & Proof of Vaccination Reminder." (Doc. No. 39-41, at 2.) Matthews announced that, "[i]f the Omicron wave continues its downward trend, our hope is to reopen

ASCAP offices on a voluntary basis in February to employees who have been fully vaccinated and cleared to return." (*Id.*) The email further announced that "March 14th [was] the earliest possible date for the mandatory return phase" and that, "[i]n preparation for [ASCAP's] mandatory phase of reopening, all U.S. ASCAP employees must submit proof of full vaccination to Human Resources no later than next Tuesday, February 1, 2022 in order to be compliant with [ASCAP's] policies and procedures." (*Id.*) The email again explained that the company's definition of "full vaccination" included a booster shot where eligible, that the "February 1st deadline for submitting proof of vaccination will not change, even if [the] reopening schedule is adjusted," and that the "vaccination policy extends to all ASCAP employees, whether previously remote or in-office, except where prohibited by law or regulation *as determined by ASCAP*." (*Id.* (emphasis added).)

As of February 23, 2022, twenty ASCAP employees had sought accommodations in accordance with the COVID-19 Vaccine Policy for medical conditions or sincerely held religious beliefs. (Doc. No. 39-31, Erickson Decl. ¶ 45.) Patricia Erickson reviewed each accommodation request. (*Id.* ¶ 46.) Where necessary, and consistent with ASCAP's COVID-19 Vaccine Policy, either Erickson or someone under her direction sought additional documentation supporting employee accommodation requests. (*Id.* ¶ 47.) As of February 23, 2022, ASCAP had granted eleven employees accommodations under the COVID-19 Vaccine Policy based on the employees' sincerely held religious beliefs and had granted six employees accommodations for medical conditions. (*Id.* ¶ 48.) ASCAP did not grant an accommodation to any employee who sought an accommodation but did not submit supporting documentation. (*Id.* ¶ 49.) ASCAP did not permit any employee who was not fully vaccinated (including a booster shot where required) to continue to work for ASCAP in person. (*Id.* ¶ 50.)

### D.     Milam's Termination

As noted above, there is no evidence that anyone at ASCAP was aware that Milam had experienced Bell's palsy in 2019. Nor was anyone aware that he allegedly suffered a second episode of Bell's palsy or that he began experiencing a decline in his hearing beginning shortly after receiving the COVID vaccine in March 2021.

At 8:24 AM on December 1, 2021, Milam wrote to ASCAP: "I have a runny nose and head congestion this morning. Let me know if it is ok to go to work?" (Doc. No. 39-46, at 2.) In her capacity as Site Safety Monitor, Carole Resseque received and responded to this email. Following ASCAP's procedures, her response was: "Mickey – since these are possibly symptoms of Covid, please remain home and someone from ASCAP will be in contact with you shortly." (*Id.*)

On December 2, 2021, Milam sent a follow-up email to ASCAP, stating:

> I went to my PCP, Dr Dinella this morning at 9:45 AM. He suspected a sinus and ear infection, but because I also had sudden hearing loss in my right ear, he referred me to an ENT. I asked for a Covid test, but his group only performs Covid testing in the parking lot before the patient enters the building, so he was unable to do this.
>
> I was able to see the specialist this afternoon. She performed a hearing test and determined I have complete hearing loss in my right ear. She prescribed a high dose of steroids for inflammation. The ENT said they are sometimes seeing a sudden loss of hearing in Covid patients. She sent me to a nearby clinic to have a covid test, which was negative.
>
> Sorry for the delay in sending in the Besafe Covid paperwork, I did not arrive home until 7:30 PM.

(Doc. No. 39-22, at 2.) Milam confirmed that Dr. Guthrie was the specialist to whom he was referring in this email. (Milam Dep. 156.) Resseque responded, "So sorry to hear this and I hope the steroids help." (Doc. No. 39-48, at 2.) In addition, consistent with ASCAP's policies, he was directed not to return to ASCAP's offices until at least the following week. (Doc. No. 39-47, at 2.)

On December 8, 2021, Milam texted Roberts that he had a "follow up doctors appointment for the sinus infection at 3:30 today." (Doc. No. 39-50, at 2.)

Milam now claims Dr. Guthrie associated his hearing loss with the Bell's palsy and the COVID vaccine. (*See* Milam Dep. 17–18 ("[S]he said I had almost total hearing loss in my right ear. She said she would not take a chance on taking the second shot since it happened so immediately after the first shot. She would not take a chance on losing the hearing in my left ear. Then I'd be totally deaf. . . . And that Bell's palsy, she said, was 20 percent or more likely to be a lifelong problem. And I've had it twice already, so I didn't want to take a next shot, possibly have Bell's palsy for the rest of my life.").) In his deposition, Milam testified that Dr. Guthrie told him both "in person and over the phone" that he should not get a booster shot because he had experienced Bell's palsy with the first shot. (*Id.* at 12.) He also claimed that he called Dr. Guthrie in December, because ASCAP was "wanting the exemption signed." (*Id.* at 13.) He claims that, when he called to ask her about ASCAP's vaccine-exemption paperwork, Dr. Guthrie told him that she would sign his paperwork for him. (*Id.*) The plaintiff's statement of what Dr. Guthrie told him is inadmissible hearsay not subject to any exception, *see* Fed. R. Evid. 802, 803, and the medical treatment notes and the medical record from Dr. Guthrie's office do not reflect that any of this occurred.[10] Moreover, the plaintiff has not proffered on summary judgment any proof from Dr. Guthrie, whether by deposition or declaration.

Despite his doctor's purported warning and despite receiving the email reminders referenced above, Milam did not contact Erickson or any other Human Resources professional to request an accommodation exempting him from obtaining a COVID-19 vaccine booster shot as of the January 5, 2022 deadline; nor did he submit documentation to support any such request by the

---

[10] Milam also testified that some doctor whose name he cannot recall told him that he "should never have the vaccine" and told him that she would make a notation in his record to that effect. (Milam Dep. 35–36.) He believes this took place after his termination. (*Id.* at 36.) Again, none of the medical records filed as exhibits in this case contain any such notation.

January 15, 2022 deadline. He claims, however, that he called Gloria Svabenik sometime in December to tell her that his doctor would "sign any of the paperwork [he] needed" and to ask her to send the forms he needed. (*Id.*) However, Svabenik, according to Milam, told him he did not need to worry about it, telling him, "You're safe. You don't have anything to worry about," and she did not send him any paperwork. (*Id.* at 13, 16, 20.)

Milam also claims that he and Svabenik discussed Tennessee law relating to the COVID vaccine,[11] and Svabenik told him it was her understanding that Tennessee employees cannot be compelled to provide proof of vaccination if they opposed receiving the vaccine. (Milan Decl. ¶ 22; Milam Dep. 118–10.) Milam states in a Declaration that he "was aware of the general protections afforded by Title 14" and "believed that Tennessee law protected [him] from being compelled to provide proof of vaccination if [he] made [his] opposition to receiving the COVID-19 vaccine known to [his] employer, which [he] discussed with Svabenik and Roberts during [his] employment." (Milam Decl. ¶¶ 11, 12.) Roberts denies ever discussing Title 14 with Milam. (Roberts Dep. 38.) It is unclear whether Svabenik was asked specifically about this topic, but she states in her Declaration that she "had no reason to believe Milam or anyone else at ASCAP did not need to comply with its COVID-19 Vaccine Policy" and that she did not tell Milam that he did not need to comply with it. (Svabenik Decl. ¶ 20.) According to Milam, after Svabenik allegedly told him "You're safe," he called Dr. Guthrie's office back to tell her he would not need her to

---

[11] It is undisputed that, on November 12, 2021, Tennessee enacted into law Title 14 of the Tennessee Code, Tenn. Code Ann. §§ 14-1-101 to 14-6-105 ("Title 14"). Among other provisions, Title 14 provided that "[a] private business . . . shall not compel or otherwise take an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Tenn. Code Ann. § 14-2-102(a). The plaintiff, however, did not file suit based on Title 14 but, rather, for disability discrimination under the ADA.

sign his exemption form after all. (Milam Dep. 13.) Again, ENT of Nashville's records do not reflect such a call.

According to Svabenik, she did not know that Milam suffered hearing problems of any kind until this lawsuit was filed. (Svabenik Decl. ¶ 13.) She also states that she was aware of ASCAP's COVID-19 Vaccine Policy, pursuant to which, if any employee attempted to discuss a medical condition or a medical or religious need for an accommodation, she should instruct the employee to speak with Human Resources and only with Human Resources. (*Id.* ¶ 15.)

On January 19, 2022, following a conversation with Svabenik about his history of Bell's palsy, Milam sent Svabenik an email containing links to articles about Bell's palsy and the COVID-19 vaccine. (*Id.* ¶ 16; *see also* Doc. No. 39-53, at 2.) Svabenik received the email but does not recall whether she read any of the articles. (Svabenik Decl. ¶ 16.)

On January 24, 2022, Svabenik sent Roberts an email that included "**Nashville employee boosters**" on a list of matters they needed to discuss. She specifically stated that Milam was "on the fence to get the booster" and noted that "[a]pparently no other company in TN is requesting." (Doc. No. 45-27.)

On January 25, 2022, Milam sent Svabenik an email with the subject "N.Y. Times published today OSHA withdrawal of mandate." (Doc. No. 39-23, at 2.) The email states, "Gloria, Biden administration acknowledged what most businesses expected: the plan to make companies mandate vaccines-or-tests is over." (*Id.*) It included a link to a New York Times article discussing a Supreme Court decision invalidating the U.S. Labor Department's Occupational Safety and Health Administration ("OSHA") rule requiring workers to be vaccinated against COVID-19 or test weekly. *See* https://www.nytimes.com/2022/01/25/business/osha-vaccine-mandate.html.

On January 26, 2022, Milam sent Svabenik a text that stated: "I am not concerned with the booster vaccine now with the courts decision. Please take that off your list to discuss my personal concerns of Bells Palsy with Brian." (Doc. No. 39-25, at 2.) Milam confirmed that his reference to the "courts decision" was to the Supreme Court's decision invalidating the OSHA rule, also referenced in his January 25, 2022 email to Svabenik. (Milam Dep. 133–34.)

However, at 10:00 a.m. on January 28, 2022, two hours after Matthews sent the email reminder about the company's COVID-19 Vaccine Policy and the February 1, 2022 deadline for submitting proof of vaccination in compliance with the company's policy (Doc. No. 39-41, at 2), Milam sent Svabenik a text message that stated: "After the email from Beth [Matthews] this morning. I am preparing an email about my Bells Palsy reaction. Are you ok with me coping [sic] Brian [Roberts]?" (Doc. No. 39-26, at 2.) Consistent with ASCAP's policy, Svabenik responded: "No this should be with HR only." (*Id.*; *see also* Svabenik Decl. ¶ 19.)

Shortly after that exchange, at 10:12 a.m. EST, Milam sent an email to Patricia Erickson, the subject line of which was "What should I do to be in compliance with ASCAP." (Doc. No. 39-42, at 2.) In this email, he told Erickson:

> Doctor Guthri [sic] my doctor said I should definitely not have the vaccine again because of the Bells Palsy reaction I had to the first shot.
>
> In my case the second day after the shot, I had a sudden weakness in my facial muscles. The weakness made half of my face appear to droop. My eye and mouth resisted closing for weeks. I also had pain in the ear and sensitivity to sound. The pain in my ear and the sensitivity to sound has not gone away.
>
> Canada has placed a Bells Palsy Warning on the label of the shot. All of the vaccines have cases of Bells Palsy related to the shot within days of the shot.

(*Id.*) Milam then provided a link to a news article from a Canadian online publication reporting that, while Health Canada updated the label for the Pfizer-BioNTech COVID-19 vaccine "to reflect very rare reports of Bell's Palsy," "[t]he benefits of COVID-19 vaccines continue to

outweigh their potential risks, as scientific evidence shows that they reduce deaths and hospitalizations due to COVID-19." *See* globalnews.ca/news/8092666/health-canada-bells-warning-pfizer-covid-vaccine/.

According to Milam's testimony, ASCAP would have already known of his concerns about getting the booster, because he allegedly had telephone conversations with Svabenik and Roberts in late November and December 2021 about his health conditions and concerns about taking the vaccine again. (Milam Dep. 118, 121.) He claims that, before "disclosing [his] conditions," he had positive relationships with both Roberts and Svabenik, but, after the purported disclosure, the relationships became "somewhat strained." (Milam Decl. ¶ 20.)

He alleges that he told Svabenik sometime in December 2021 that he was "struggling to hear," and Svabenik responded "curtly," "Well, how can you do your job" and "condescending[ly] questioned whether [he] 'could hear what was going on' in the facility." (Milam Decl. ¶ 19.) Svabenik avers, to the contrary, that she was not aware of Milam's work performance ever being affected by Bell's palsy, ear pain, sensitivity to sound, or hearing problems of any kind, and she was not aware that he allegedly suffered from hearing problems of any kind until she "read Mr. Milam's lawsuit." (Svabenik Decl. ¶¶ 12–13.) The only discussion with Milam about his reaction to the vaccine that Svabenik recalls was in the January 28, 2022 text exchange, when she told him that he should contact Human Resources. (*Id.* ¶ 19; *see also* Doc. No. 39-26, at 2.)

Roberts attests that, in all of his exchanges with Milam through February 29, 2022, he "never experienced any difficulties communicating with him," and "Milam never indicated to [him] that he had any trouble hearing." (Roberts Decl. ¶ 13; *see also* Roberts Dep. 60.) Roberts testified in his deposition that Milam told him in mid- to late-January 2022, or perhaps late-January or early February, that he had experienced some "health issues," including hearing loss and Bell's

palsy, as a result of the COVID vaccine. (Roberts Dep. 23–24, 66.) Roberts denied having any knowledge prior to Milam's becoming a full-time employee that he claimed to have experienced Bell's palsy and hearing loss. (*Id.* at 24.) In addition, Roberts "never observed that Milam's work performance was impacted by Bell's palsy, ear pain, sensitivity to sound, or hearing problems of any kind," and no one else ever told him that Milam's work performance was impacted by these conditions. (Roberts Decl. ¶ 14.)

Roberts likewise denies that Milam ever told him in November or December 2021 that he was suffering from a reaction to the COVID-19 vaccine and states that he did not know until late January 2022 that Milam was concerned about getting a booster vaccine or was seeking a medical accommodation to excuse him from getting the booster. (Roberts Decl. ¶¶ 18–19.)

In any event, Erickson responded to Milam's January 28 email the next day, January 29, 2022, as follows:

> Hi Mickey,
>
> Employees asking for a delay in getting the booster, once eligible to receive one, for health reasons are being asked to submit an accommodation request for the exception. Please see the letter and form attached.
>
> Please let me know if you have any questions or would like to speak on Monday.
>
> Best,
>
> Patty

(Doc. No. 39-27, at 2.) Erickson included an attachment to the email consisting of a cover letter to Milam, a form letter addressed to Milam's "Treating Healthcare Provider," a form letter for Milam to sign, authorizing his doctor to complete the form and to provide the requested information to his employer, and a form for the healthcare provider to complete. (*See* Doc. No. 39-27, at 3–6.) Milam does not dispute receiving these documents.

The letter addressed to Milam explained in part:

> In order for us to fully and properly assess your request, we require that you provide the attached letters to your treating healthcare provider and request that they provide us with the information requested therein to me at perickson@ascap.com **by no later than close of business on February 4, 2022.**

(Doc. No. 39-27, at 3 (emphasis in original).) Erickson then again provided her number and advised Milam to contact her with any questions. (*Id.*) It is undisputed that Erickson's response and the attached documentation were consistent with ASCAP's response to all other requests for medical accommodation from the COVID-19 Vaccine Policy.

On February 3, 2022, Human Resources sent Milam an email reminding him that he had missed the February 1, 2022 deadline to submit proof of vaccination and advising him that because he had "not submitted proof of full vaccination or an exemption request and supporting documentation by the applicable deadlines," he was "not in compliance with ASCAP's mandatory vaccination policy applicable to all employees, which is a material term of your employment." (Doc. No. 39-44, at 2.) Human Resources advised,

> You must submit proof of full vaccination to immediately correct your non-compliance. **If you do not cure your policy violation and submit proof of full vaccination by February 7th, 2022, ASCAP reserves the right to take disciplinary action, up to and including termination of employment for failure to comply with ASCAP's stated policy.**

(*Id.* (emphasis in original).)

On February 4, 2022, Milam emailed Erickson as follows:

> Hi Patty,

> I mailed the paperwork to my provider's office. Unfortunately, Dr. Guthrie has left the practice, and I have been unable to get a forwarding email for her. She has me scheduled for a brain MRI this afternoon. I am not sure yet which doctor will follow up with these results.

> According to Dr. Guthrie, 15% of Bell's Palsy [sic] patients never recover from the facial paralysis, so I hope you can understand my concern with getting the booster given the issues I had after my initial vaccine.

Thanks

Mickie Milam

(Doc. No. 39-28, at 2.)

As set forth above, ENT of Nashville's medical records filed in this case do not reflect either that Milam sent ASCAP's paperwork to that office or that Dr. Guthrie voiced any opinion regarding Milam's experience with Bell's palsy. However, Milam also testified during his deposition that he emailed the forms to Dr. Guthrie's office and then called and told the receptionist to "be on the lookout for [them]." (Milam Dep. 219.) He testified that he told the person with whom he spoke that his "job depended on it." (*Id.*) He also stated that the person he spoke with told him Dr. Guthrie had left the practice but that "they would send it on to the proper person to take care of it." (*Id.* at 220.)

Milam further testified that he had requested a copy of his medical records from ENT of Nashville "a year or two" before his deposition, and, at the same time, he "spoke with the lady at the front desk" and "asked her if she would find out if they responded to ASCAP." (*Id.* at 34.)[12] More specifically, he asked her if she could tell if his accommodation paperwork was sent to ASCAP, and she responded that "all paperwork that comes in the office is filled out and sent to . . . whoever . . . . She said it's always filled out. So I assumed that ASCAP got the paperwork." (*Id.* at 34–35.)[13] He claims in this lawsuit that, because he did not hear back from ASCAP, he assumed that it had received his paperwork. (*Id.* at 220.)

---

[12] ENT of Nashville's medical records reflect that Milam called in on March 23, 2022, requesting a copy of all of his medical records. (Doc. No. 39-18, at 5.) He also stated that he had filled out a medical release form the previous Friday, March18, 2022 but had not heard back, and he reported that he "need[ed] his medical records for suing his previous job for refusing to take the covid booster shot." (*Id.*)

[13] The timing of Milam's supposed follow-up is unclear. In his Declaration, he makes it sound like this occurred immediately after he made the request. (*See* Milam Decl. ¶ 38 ("After

Erickson did not respond to Milam's February 4 email. According to Erickson, neither Milam nor his healthcare provider submitted the necessary paperwork by the February 7, 2022 extended deadline, and, after February 4, 2022, Milam did not initiate contact with Erickson or any other Human Resources professional to request an additional extension. (Erickson Decl. ¶ 42.) After February 4, 2020, ASCAP did not follow up with Milam again to inquire about the missing form. Likewise, Milam never contacted Erickson or any other Human Resources professional to verify receipt of his form.

On February 28, 2020, Roberts and Erickson notified Milam over the phone that ASCAP was terminating his employment due to his failure to comply with the COVID-19 Vaccine Policy.[14] According to Erickson, Milam did not ask for an extension during the termination phone call on February 28, 2022; nor did he explain why he did not submit the requested paperwork by the February 4, 2022, deadline or why he failed to contact Human Resources between February 4, 2022, and February 28, 2022. (Erickson Decl. ¶ 44.) Milam does not claim that he protested his termination during this phone call or even that he tried to explain that he believed his medical provider had submitted an accommodation form.

On February 29, 2022, Milam met with Roberts in person and walked him through the Nashville facility. Milam claims that, during the walk-through, he asked if anything could be done

_____

February 4th, I gave a follow up call to my medical provider and asked about the status of the accommodation forms, to which the front desk employee responded: "It's taken care of, filled out, and sent back.").) His deposition testimony indicates that this conversation occurred after his termination, when he went back to doctors' offices to request a copy of his medical records.(*See* Milam Dep. 34 ("[A]t the same time when I went over and asked for [the medical records], I spoke with the lady at the front desk. And I asked her if she would find out if they responded to ASCAP. She said all paperwork that comes in the office is . . . always filled out."); *id.* at 221–22 ("And I also went and followed up with the lady at the desk and asked them what they do with the paperwork. And she said it's taken care of, filled out, and sent back.").)

[14] Svabenik had no role in evaluating any accommodation request made by Milam (or lack thereof), and had no role in the decision to termination his employment. (Svabenik Decl. ¶ 21.)

to allow him to keep his job. (Milam Dep. 245.) He purportedly asked whether, if he took the COVID booster, he could keep his job. Roberts allegedly responded that Matthews had made up her mind and was "convinced that [Milam] couldn't do [his] job because of the Bell's palsy and the . . . hearing loss."[15] (Milam Dep. 245.) Roberts denies ever telling Milam that ASCAP was unwilling to reconsider his termination due to his Bell's palsy, hearing loss, or any other actual or perceived physical impairment. (Doc. No. 39-49, Roberts Decl. ¶ 22.) He also states that the only conversations he had with Beth Matthews relating to Milam "concerned his failure to follow ASCAP's COVID-19 Policy, how ASCAP would go about replacing him, and offering him a remote consulting role."[16] (*Id.*)

After the walk-through with Roberts, Milam turned over his ASCAP property and left the premises. ASCAP continued to pay Milam his base salary and benefits through March 14, 2022, at which point his employment with ASCAP terminated.

Milam filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 24, 2022, alleging discrimination and retaliation based on age and disability. The EEOC determined that it would not proceed further with its investigation and issued a notice of right to sue on December 16, 2022.

---

[15] This is double hearsay. However, as both Roberts and Matthews qualify as agents of ASCAP, the plaintiff's testimony about what Roberts told him about what Matthews believed (or told him) is admissible as the statement of a party opponent under Rule 801(d)(2)(D) of the Federal Rules of Evidence.

[16] No testimony from Matthews, whether by declaration or deposition, is in the court's record.

## III.    DISCUSSION

### A.    ADA Discriminatory Termination Claim

#### 1.    *Legal Framework*

ADA discrimination claims are analyzed under "two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016)). These two methods are typically "mutually exclusive; a plaintiff need only prove one or the other, not both." *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). If a plaintiff has direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework does not apply. *Fisher*, 951 F.3d at 416.

Direct evidence of disability discrimination "does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (citation and internal quotation marks omitted).[17] "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted). Direct evidence includes "evidence that the employer relied on the plaintiff's disability in making its employment decision." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). Direct evidence might "take the form, for example, of an employer telling an employee, "I fired

---

[17] At trial, the plaintiff will be required to prove, not that his disability was a motivating factor in the termination decision, but instead that he was terminated "because of" his disability. *Lewis*, 681 F.3d at 321; *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). "Because of" means "but-for" causation. *Id.* at 318. "Under *Gross*, satisfying but-for cause requires plaintiffs to show that [disability] 'had a determinative influence on the outcome' of the employer's decision-making process." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Gross*, 557 U.S. at 176).

you because you are disabled." *Burress v. City of Franklin*, 809 F. Supp. 2d 795, 810 (M.D. Tenn. 2011). The plaintiff here contends that he has direct evidence that the defendant had a discriminatory motive in carrying out its employment decision, in the form of Matthews' purported belief, as relayed to the plaintiff by Roberts, that he could not do his job due to his hearing loss and Bell's palsy.[18] ASCAP, in its Reply, contends only that the existence of direct evidence does not necessarily preclude summary judgment. (Doc. No. 49, at 7 n.6 (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 586 (6th Cir. 2003)).)

To avoid summary judgment on a discrimination claim based on direct evidence, the plaintiff must present evidence sufficient, at a minimum, to give rise to a material issue of fact as to whether he is disabled and suffered an adverse employment action because of his disability. *See* 42 U.S.C.A. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees."). If a plaintiff presents direct evidence of discrimination, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015).

Thus, the threshold question in any disability discrimination case is whether the plaintiff suffered from a "disability" as defined by the ADA. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment, and "being regarded as having such an impairment." 42 U.S.C. § 12102(1). The implementing regulations define "[p]hysical or mental impairment" to include "[a]ny

---

[18] Most ADA claims involving direct evidence are failure to accommodate rather than simply discriminatory termination claims.

physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1); *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020). This is not a "demanding standard." *Darby*, 964 F.3d at 445 (citing 29 C.F.R. pt. 1630, App. § 1630.2(j)(1)(iv)).

"'Substantially limits' is a relative term, one defined in relation to a person's ability to perform a major life activity 'as compared to most people in the general population.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). "An impairment 'need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). "Hearing," along with "communicating" and "working," is expressly enumerated in the statute as a "major life activity." 42 U.S.C. § 12102(2)(A). Finally, "for cases on the margin," the ADA "instructs that the definition of disability 'shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of the ADA." *Darby*, 964 F.3d at 445 (quoting 42 U.S.C. § 12102(4)(A)).

"A plaintiff has a 'record of impairment' if he or she 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *Spence v. Donahoe*, 515 F. App'x 561, 570 (6th Cir. 2013) (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002)); *see also Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 435 (6th Cir. 2016) (stating that, for purposes of the "record of impairment" prong, "some diagnosis must explain the duration or severity of the impairment," and holding that "self-described symptoms to [the plaintiff's] physicians, without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity").

A plaintiff can prove that he is "regarded as" disabled by his employer for purposes of § 12102(1)(C) if he can show that he "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C.A. § 12102(3)(A). However, "Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less. *Id.* § 12102(3)(B). "Federal regulations then clarify that this 'transitory and minor' limitation is an affirmative defense that the employer bears the burden of proving, and that 'physical impairment' is otherwise defined broadly, to include 'any physiological disorder or condition . . . affecting one or more body systems.'" *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) (quoting 29 C.F.R. §§ 1630.15(f), 1630.2(h)).

### 2. *Whether the Plaintiff Was Disabled Under the ADA*

The plaintiff claims both that he was actually disabled, had a record of disability, and was "regarded as" disabled. His claimed disabilities are (1) Bell's palsy and (2) "severe" hearing loss associated with tinnitus, pain in the ear, and sensitivity to sound. (*See* Doc. No. 43, at 16, 17.)

### a) *Actual Disability*

The plaintiff alleges that his Bell's palsy and his hearing problems constitute actual disabilities. For purposes of his discriminatory termination claim, the plaintiff does not appear to claim that a medical inability to tolerate the COVID-19 vaccination (or a risk of intolerable side effects) constitutes a disability.[19] Regarding his Bell's palsy, assuming, as the plaintiff alleges, that

---

[19] Several courts have found that a medically unsubstantiated fear of vaccination is not an impairment that can constitute a disability. *See, e.g.*, *Chauvin v. Terminix Pest Control, Inc.*, No. CV 22-3673, 2023 WL 3569120, at *3 (E.D. La. May 19, 2023) (where the plaintiff claimed that "'fear of adverse events in light of his past experience with the flu shot' substantially limits his ability to take certain medications and vaccinations," the court found that "the inability to take certain medications and vaccinations is not a major life activity akin to speaking, breathing, seeing,

he experienced an episode of Bell's palsy following his COVID-19 vaccine[20] and that the associated facial paralysis lasted for several months, and even assuming, as he claims, that the episode substantially interfered with the major life activities of eating, drinking, and communicating, there is no evidence that anyone at ASCAP knew about the episode while it occurred. The test for disability discrimination, moreover, "is applied as of the time that the adverse employment action (here the termination) occurred." *Dorsey v. DeJoy*, No. 1:18-cv-615, 2022 WL 908855, at *12 (S.D. Ohio Mar. 29, 2022) (citing *Bush v. Donahoe*, 964 F. Supp. 2d 401, 417 (W.D. Pa. 2013) ("[W]ith regard to the 'actual disability' prong, the test is whether, at the time of the adverse employment action, the limitation caused by the impairment was 'substantial.'")); *see also Schmidt v. St. Elizabeth Med. Ctr.*, No. 2:18-cv-110(WOB-CJS), 2020 WL 6492912, at *9 (E.D. Ky. Nov. 4, 2020) ("[T]he relevant question on plaintiff's ADA claim is whether she was a disabled individual when she was fired."). Because there is no evidence that Milam was still experiencing Bell's palsy or any symptoms related to Bell's palsy as of the time he was terminated

---

or hearing" (citing *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 411 (8th Cir. 2018)). Other courts have found, in the context of an employer's mandatory vaccination policy, that employees who had a medical condition that prevented them from being vaccinated but were denied an exemption from the vaccination policy adequately alleged a disability for ADA purposes. *See, e.g.*, *Doe(s) v. Pittsburgh Reg'l Transit*, 684 F. Supp. 3d 417, 427 (W.D. Pa. 2023).

[20] Contrary to the plaintiff's assertions, neither Dr. DiNella nor Dr. Guthrie ever "diagnosed" Milam as having Bell's palsy following his COVID-19 vaccine. (*See* Pl.'s Statement of Additional Facts ¶ 46.) Rather, Dr. DiNella's medical records from his December 1, 2021 visit reflect that Milam had a history of ("H/O") Bell's palsy, which might have been referring to the 2018 episode. (Doc. No. 39-16, at 6.) And ENT of Nashville noted that Milam reported a history of Bell's palsy in 2017 and "ptosis" in March 2021. (Doc. No. 39-18, at 19, 21.) His "[f]acial muscles" were observed to be "intact and symmetric" on the day of his December 1, 2021 exam, however. (*Id.* at 21.) A plaintiff's report of his past medical history is not a medical diagnosis. *Accord Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 433 (6th Cir. 2016) (where the plaintiff claimed to have sleep apnea and his doctor wrote down the plaintiff's reported complaints and symptoms, finding that a plaintiff's "bare assertions of sleep apnea, without any supporting medical evidence, cannot establish a 'physical or mental impairment' within the meaning of the ADA").

(or even as of the date he first went to the doctor for his hearing problems in December 2021), the Bell's palsy was not an actually disabling condition.[21]

Regarding his hearing, there is no dispute that Milam suffered an episode of substantially worsened tinnitus and severe hearing loss in late November 2021, for which he sought medical treatment. He alleges that, while his hearing improved after a course of high-dose steroids, he remains functionally deaf in his right ear and that this partial deafness substantially interferes with his ability to hear, as he cannot hear sounds coming from the right side. (*See* Milam Dep. 22.) As set forth above, the "disabled" element of an ADA claim is not intended to be a high threshold. The court finds that the plaintiff's allegations that he is almost completely deaf in his right ear is sufficient, at a minimum, to create a material factual dispute as to whether he is actually disabled (and was disabled at the time of his termination) for purposes of the ADA.

b)     A "Record of" Disability

The plaintiff contends he had a "record of" being disabled by Bell's palsy. (*See* Doc. No. 43, at 17 ("[T]he record is sufficient to establish that Milam's Bell's palsy is a disability. Milam has a medical record of diagnosis and suffering this neurological disorder causing cosmetic disfigurement and affecting one or more body systems. 29 C.F.R. § 1630.2(h)(1).").) The record does not support this contention. Although Milam experienced symptoms of "mild left facial

---

[21] The plaintiff's association of his Bell's palsy with his hearing loss to claim that he was still experiencing Bell's palsy when he was terminated is supported solely by the plaintiff's speculation, and the plaintiff is not qualified to offer a medical opinion regarding his diagnosis or the cause of his condition. *Accord Good v. BioLife Plasma Servs., L.P.*, 605 F. Supp. 3d 947, 964 (E.D. Mich. 2022) ("[I]n cases where, as here, the plaintiff alleges a medically diagnosable injury . . . , the plaintiff may typically testify regarding her symptoms but not regarding the underlying medical diagnosis" and may not testify as to causation if "there are multiple possibly causes . . . or where specialized medical issues are involved" (citations omitted)). Milam admits, moreover, that no healthcare professional ever diagnosed his hearing problems as connected to his alleged Bell's palsy. (Milam Dep. 172.)

weakness, mild decreased taste on that side," and initial inability to close his left eye fully and was diagnosed with "Left-sided Bell's palsy" in July 2018, according to his medical records, that episode was "mild" and transient, already largely resolved one day after he began experiencing symptoms, when he saw his physician. (Doc. No. 39-20, at 39.) He could already close his eye, and he did not report any trouble swallowing, speaking, or understanding speech. (*Id.* at 38.) His doctor did not prescribe treatment. Although he recommended an eye patch to prevent drying, he also noted that Milam was "making such rapid progress this may not be necessary." (*Id.*)

In other words, although Milam clearly has a "record of" experiencing an episode of Bell's palsy in July 2018, nothing in the medical record suggests that this episode was sufficiently severe or lasting that it "substantially limit[ed] one or more major life activities." 42 U.S.C. § 12102(1)(A) & (B). He does not have a "record of" being disabled by Bell's palsy in 2018.

As for the purported episode in March 2021, Milam did not report experiencing symptoms that he associated with Bell's palsy to a physician until more than eight months after his symptoms occurred, at his first appointment with Dr. Guthrie. Dr. Guthrie did not "diagnose" him as having experienced Bell's palsy; she simply noted his reported symptoms. (*See* Doc. No. 39-18, at 19 ("Patient . . . reports in March 2021 he had ptosis of the same left eye after receiving the Johnson and Johnson COVID vaccine.").) As set forth above, however, a plaintiff's "self-described symptoms to his physicians, without corroborating medical evidence or any diagnosis" are not sufficient to establish "a history of . . . a mental or physical impairment that substantially limits one or more major life activities" for purposes of establishing a "record of" a disability. *Neely*, 640 F. App'x at 435. Milam, therefore, does not have a "record of" being disabled by Bell's palsy in 2021.

c)        *"Regarded As" Having a Disability*

Milam allegedly informed his supervisors at ASCAP that he was experiencing hearing loss and had experienced Bell's palsy in the past, and he also testified that, the day after he was fired, Brian Roberts told him he would not be rehired, because CEO Beth Matthews was "convinced that [he] couldn't do his job because of the Bell's palsy and [his] hearing loss." (Milam Dep. 245.) Implausible as this testimony may be, the court must credit it for purposes of the defendant's motion. If the jury believes the testimony, it would be sufficient to establish that ASCAP both knew that Milam was having difficulty hearing and had had Bell's palsy in the past and "regarded him" as disabled as a result, irrespective of whether the condition(s) actually interfered with his ability to do his job. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) (clarifying that, "to state the threshold condition of a 'regarded as' ADA claim, an employee need only show that [his] employer believed [he] had a 'physical or mental impairment,' as that term is defined in federal regulations."). The plaintiff has established a material factual dispute as to whether he was "regarded as" disabled by hearing loss and past episodes of Bell's palsy.

3.        *Was the Plaintiff Terminated Because of His Disability?*

There is no dispute that Milam was terminated, and the defendant contends that he was terminated solely because of his failure to comply with ASCAP's clearly articulated and uniformly applied COVID-19 Vaccine Policy by either presenting proof of full vaccination or timely submitting a signed exemption form from a physician. Milam asserts that Roberts' telling him that CEO Beth Matthews "was convinced that [Milam] couldn't do [his] job because of the Bell's palsy and . . . [his] hearing loss" (Milam Dep. 245) constitutes proof that his disability (or being regarded

as disabled) "was at least a motivating factor" in the termination decision. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018).[22]

The court, again, must accept Milam's statement as true, along with his testimony that Matthews was a micromanager with oversight of every decision the company made. (*See* Milam Dep. 251–52 (asserting that Matthews "micromanages" "everything that goes on at ASCAP").) If a jury believes Milam's testimony, it might believe that, but for Matthews' beliefs about Milam's hearing loss and Bell's palsy, ASCAP would not have terminated his employment and would instead have given him another chance to submit an accommodation request or get vaccinated. That is, a jury might believe that his hearing loss "'had a determinative influence on the outcome' of the employer's decision-making process." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

In sum, the plaintiff has established a material factual dispute as to whether he was terminated "because of" his disability, based on Matthews' alleged statements to Roberts. The defendant is not entitled to summary judgment on the ADA discrimination claim based on that termination. While the defendant has put on ample proof to support its position, it is for the jury, not the court, to decide whether Milam is fabricating the conversation with Roberts. *See Etienne*, 778 F.3d at 477 (holding that, to be entitled to summary judgment in the context of a direct-

---

[22] Milam also argues ASCAP's discriminatory motive is further confirmed by the supposed "sharp decline" in Roberts' and Svabenik's treatment of him after he disclosed his medical conditions to them, Svabenik's allegedly "facetious and condescending questioning of Milam's ability to do his job" (Doc. No. 43, at 18), and Erickson's inactions after the accommodation request. However, he offers no concrete examples of the "sharp decline" in his treatment, aside from Svabenik's supposed comments, and there is no evidence that Svabenik had any involvement in the decision to terminate Milam's employment. Although he claims Erickson should have reached out again to him after he failed twice to meet the deadline for submitting accommodation forms, he does not explain why she had an obligation to do so, as discussed in more detail in the discussion of the failure to accommodate claim.

evidence case, the defendant "must do more than merely identify a legitimate basis for its decision—it must show that any reasonable jury would conclude that it would have made the same decision absent the discrimination").

As an aside, the court must also address Milam's claims that "one obvious reason a jury could reasonably reject ASCAP's claim that Milam was fired because he failed to comply with its COVID-19 Vaccine Policy is because the policy was inapplicable to Milam and illegal to enforce against him here." (Doc. No. 43, at 24.) The court rejects this argument and finds that Title 14, or, more specifically, the legality of ASCAP's policy in light of Title 14, is completely irrelevant in this case. ASCAP made it clear that it intended to enforce its COVID-19 Vaccine Policy, and there is no evidence that Milam raised Title 14 as the basis for his objection to obtaining a booster shot in 2022.[23] Instead, he claims that he attempted to comply with ASCAP's policy by having his doctor submit accommodation paperwork. Moreover, the plaintiff has offered no evidence to suggest that ASCAP believed its policy to be illegal. It clearly believed the policy to be enforceable. Even if it was wrong, and even if the policy was in fact illegal, that does not mean that the company violated the ADA by enforcing it. There is simply no basis in the record for any juror to believe, as the plaintiff claims, that "ASCAP concocted an [illegal and inapplicable] claim of a policy violation as a pretext to unlawfully discriminate against him." (Doc. No. 43, at 24 (alteration in original; citation omitted).)

### B.      Reasonable Accommodation/Failure to Engage in an Interactive Process

"[A]n employer's failure to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of discrimination." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir.

---

[23] Nor has he raised a stand-alone claim based on Title 14 in this case.

2007); 42 U.S.C. § 12112(b)(5)(A)). "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence . . . of discrimination." *Id.* (quoting *Kleiber*, 485 F.3d at 868). Thus, rather than the *McDonnell Douglas* burden-shifting framework, courts use a "multi-part test to evaluate reasonable accommodation claims":

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id.* (quoting *Kleiber*, 485 F.3d at 869).

Generally, when an employee informs his employer that he has a disability that would require an accommodation, the employer has a duty under the ADA to engage in an "interactive process" with the employee in an attempt to determine whether, based on an individualized assessment of the employee's needs, a reasonable accommodation is possible. *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). "[F]ailure to engage in the interactive process is . . . an independent violation of the ADA if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation." *Id.* at 1041.

"The employee must initiate the interactive process by requesting an accommodation." *Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428, 434 (6th Cir. 2017) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)). However, "an employee need not use the magic words 'accommodation' or even 'disability,' [but] the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2007). And, although "[a]n employee might not

always need to show his accommodation is medically necessary to win a failure to accommodate claim, . . . [h]e must do so when asked by his employer." *Tchankpa*, 951 F.3d at 813.

"Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. "When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* (internal quotation marks and citation omitted).

In this case, the court has found that Milam's diminished hearing constitutes a disability but that he failed to establish that his Bell's palsy was an actual disability.[24] Typically, an accommodation for hearing loss should relate directly to the disability at issue,[25] but Milam does not allege that his hearing loss (or his history of Bell's palsy) affected his ability to work or that he needed an accommodation relating to either condition. Instead, for purposes of his failure to accommodate claim, he appears to be alleging that he was disabled as a result of the purported risk that another COVID-19 vaccine would exacerbate his preexisting medical conditions. Milam, however, has not presented evidence establishing that any medical professional associated his hearing loss or Bell's palsy to the COVID-19 vaccine; nor has he offered competent evidence that a past episode of Bell's palsy constitutes a contra-indication for receiving the COVID vaccine or booster. Milam, who is not a medical professional, may offer lay evidence regarding his symptoms and even the timing of his symptoms, but he is not competent to offer a medical opinion in the

---

[24] An employee who is "regarded as" disabled but not actually disabled is not entitled to an accommodation. *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 186 (3d Cir. 2019) (citing 42 U.S.C.A. §§ 12201(h), 12102(1)(C)). Because the plaintiff has failed to establish that he was actually disabled by Bell's palsy, he was not entitled to an accommodation for that condition.

[25] *See Tchankpa*, 951 F.3d at 812 ( "[R]equested accommodations are reasonable only if they 'address a key obstacle preventing [the employee] from performing a necessary function of [his job.]'" (quoting *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)).

form of a diagnosis of a medical condition, causation of that condition, or prognosis. *Accord Good v. BioLife Plasma Servs., L.P.*, 605 F. Supp. 3d 947, 964 (E.D. Mich. 2022) ("[I]n cases where, as here, the plaintiff alleges a medically diagnosable injury . . . , the plaintiff may typically testify regarding her symptoms but not regarding the underlying medical diagnosis" and may not testify as to causation if "there are multiple possible causes . . . or where specialized medical issues are involved" (citations omitted)); *see also Williams v. Hamilton Cty.*, No. 1:15-cv-74, 2018 WL 1586234, at *2 (E.D. Tenn. Mar. 31, 2018) ("Lay opinion testimony on a specific medical diagnosis may not be admissible without proper expert support, but lay testimony as to a plaintiff's symptoms generally is." (collecting cases)). In the absence of competent evidence, Milam cannot prove that he suffered a disability related to his ability to receive the COVID vaccine. Because Milam cannot prove that he had a disability that required an accommodation, the defendant is entitled to summary judgment on the failure to accommodate/failure to engage in the interactive process claim.

Moreover, even if the court accepts, for purposes of the defendant's summary judgment motion, that the risk of increased complications from the vaccine constitutes a "disability" for purposes of the failure to accommodate claim, in light of Milam's medical history,[26] the defendant would still be entitled to summary judgment. Milam's January 28, 2022 email to Erickson, following on the heals of Matthews' emailed reminder about the deadline for complying with ASCAP's COVID-19 Vaccine Policy, can be construed as a request for an accommodation, insofar as Milam explained to Erickson that his doctor had told him he should not obtain another vaccine

---

[26] *See Doe(s) v. Pittsburgh Reg'l Transit*, 684 F. Supp. 3d 417, 427 (W.D. Pa. 2023) (finding for purposes of the defendant's motion to dismiss that plaintiffs "who had a medical condition preventing them from getting the [COVID] vaccine (and were denied an exemption)" had an impairment that "substantially limited" them from engaging in the "major life activity" of working, once the employer's mandatory vaccination policy was implemented).

due to his reaction to the first vaccine. In response, Erickson promptly supplied all of the information and forms Milam needed in order to submit a request for an accommodation that would exempt him from the company's vaccination requirement. The company requested medical documentation to support Milam's request for an accommodation, as it was entitled to do. *Tchankpa*, 951 F.3d at 813. The company never received such documentation, though it did receive one more email from Milam, stating that he was not sure who at his medical provider's office would respond to his request. Neither Milam nor ASCAP followed up to inquire about receipt of the requested paperwork.

The parties both point at each other as the cause of the breakdown in the interactive process. ASCAP, however, had responded to Milam's request for an accommodation by proposing a reasonable accommodation: that Milam provide medical documentation to support his request for an exemption from the COVID-19 Vaccine Policy. After ASCAP made this proposal, provided detailed instructions for how to comply with it, and then extended the deadline for compliance (again) to February 7, 2022 (Doc. No. 39-44, at 2), Milam had a responsibility to provide the requested documentation. Irrespective of his protests of good faith and diligent effort, he has presented no evidence that ASCAP acted in bad faith or that it was required to do more than it did. Indeed, based on the timing of events, including Milam's waiting until after the deadline had passed—despite numerous reminders—before requesting an accommodation, the company was entitled to believe that he had abandoned the process and thus had no obligation to inquire further when Milam failed to provide the requested documentation within the extended deadline for doing so.

In other words, even if Milam could establish a disability for which he was entitled to an accommodation, he cannot show that ASCAP failed to offer a reasonable accommodation or that

it failed to engage in good faith in the interactive process. On this basis too, ASCAP is entitled to summary judgment on Milam's failure to accommodate/failure to engage in the interactive process claim.

### C. Retaliation

Milam does not claim to have direct evidence of retaliation, and ADA retaliation claims based on indirect evidence are assessed under the *McDonnell Douglas* framework. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). To establish a *prima facie* case of retaliation, the plaintiff must show that (1) he engaged in protected activity; (2) the defendant knew he exercised his protected right; (3) the defendant subsequently took an adverse employment action against him; and (4) the employee's "protected activity was the but-for cause of the adverse employment action." *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022) (quoting *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020)). Establishing a *prima facie* case of retaliation is a "low hurdle." *Rorrer*, 743 F.3d at 1046.

If the plaintiff meets this burden, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. If it does so, the burden shifts back to the plaintiff to show "that the proffered reason for the action was pretext for unlawful retaliation." *Boshaw*, 32 F.4th at 605.

ASCAP argues that, even assuming that Milam engaged in protected activity by seeking an accommodation under the ADA,[27] his retaliation claim fails, because he cannot establish a causal connection between the protected activity and his termination and because, even if the court finds the one-month gap between the request for an accommodation and the termination to be

---

[27] A request for an accommodation is protected activity under the ADA. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013).

sufficient evidence of causation, intervening causes dispel any possible inference of a causal connection. It also asserts that the evidence in the record "overwhelmingly contradicts any claim of retaliatory animus" (Doc. No. 39, at 21), which the court construes as an argument that the plaintiff cannot establish that the proffered reason for termination—the failure to provide the requested medical documentation to support the requested accommodation—was pretext for retaliation for requesting the accommodation in the first place.

The plaintiff argues that the short period of time between his request for an accommodation and his termination is sufficient to establish a causal connection and that ASCAP's "abandonment of the interactive process indicates animus for making the accommodation request." (Doc. No. 43, at 23.)

The Sixth Circuit has recognized that very close temporal proximity between protected conduct and an adverse employment action may qualify as evidence of a causal connection. *See, e.g.*, *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). An inference of causation may arise based on temporal proximity when the adverse employment action occurs "just days or weeks from when the employer learns of the employee's protected activity." *Id.* (citations omitted).

Here, the court accepts for purposes of the motion for summary judgment that the passage of four weeks between the protected activity and the adverse action may be sufficient, standing alone, to give rise to an inference of a causal connection. However, ASCAP has proffered a legitimate, non-retaliatory reason for the action—Milam's failure to comply with its COVID-19

Vaccine Policy, which required him either to submit proof of full vaccination or to submit a properly supported request for a medical accommodation by a specific date. Milam does not dispute the fact that ASCAP never received the requested paperwork from his medical provider. He contends only that ASCAP's abandonment of the interactive process indicates animus. But, as set forth above, he has not established that ASCAP abandoned the interactive process, and his assertion that ASCAP "vigorously wanted all employees to have updated vaccination" (Doc. No. 43, at 23) ignores the fact that ASCAP attempted to address the plaintiff's request and considered—and granted—other employees' accommodation requests under its COVID-19 Vaccine Policy. (Erickson Decl. ¶¶ 45–50).

The court finds that there is insufficient evidence in the record to permit a reasonable jury to conclude that ASCAP's proffered reason for the plaintiff's termination—his failure to timely comply with the company's COVID-19 Vaccine Policy—was pretext for retaliation.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant in part ASCAP's Motion for Summary Judgment and dismiss the plaintiff's claims for failure to accommodate/failure to engage in the interactive process and retaliation. Because the plaintiff's testimony gives rise to a material factual dispute as to whether he was terminated because of a disability, as defined by the ADA, the motion will be denied as to the plaintiff's claim of ADA discrimination. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge